JEWETT BROS. & JEWETT v. CHICAGO, M. & ST. P. RY. CO.

(Circuit Court, D. South Dakota. September 27, 1907.)

No. 497.

1. COURTS—JURISDICTION OF FEDERAL COURT—SUIT TO ENJOIN INTERSTATE CARRIER FROM PUTTING INTO EFFECT UNLAWFUL RATE.

A Circuit Court as a court of the United States has jurisdiction of a suit by a shipper to enjoin a railroad company from putting into effect a proposed rate alleged to be unlawful, as in violation of the interstate commerce law, either as unreasonable and unjust in itself or discriminatory, when the jurisdictional amount is involved.

2. EQUITY—JURISDICTION—ADEQUATE REMEDY AT LAW.

Such a suit is also within the jurisdiction of the court as a court of equity; the complainant being without adequate remedy at law.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 19, Equity, §§ 151–163.]

**8. SAME—ANCILLARY SUIT FOR INJUNCTION.**

A court of equity cannot entertain a suit for a temporary injunction to restrain an interstate carrier from putting into effect an alleged unlawful rate, where such suit is merely in aid of a proceeding instituted before the Interstate Commerce Commission to have such rate declared unlawful, since the commission is without power to pass on a rate which is merely proposed by a carrier, but which has not been put into effect.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 19, Equity, §§ 99–102.]

In Equity. On final hearing.

Bailey & Voorhees (A. B. Kittridge, of counsel), for complainant.
Burton Hanson and William G. Porter, for defendant.

CARLAND, District Judge. The above action has been submitted to the court upon the pleadings and certain stipulated facts.

From said pleadings and stipulation, the following material facts appear: The complainant is a corporation organized under and by virtue of the laws of the state of South Dakota, and is doing business at the city of Sioux Falls, in said state. It is engaged in the business of a wholesaler and jobber in groceries, fruits, cured meats, and other commodities, generally dealt in by wholesale jobbers and retail grocers. In carrying on its said business of a wholesaler and jobber it purchases in the markets the commodities in which it deals in large quantities, and ships the same from the centers of manufacture or of distribution to the said city of Sioux Falls. A large portion of the commodities so purchased, shipped, and dealt in are purchased in the markets at Chicago, Ill., or other west shore Lake Michigan points, or at a market located east of Chicago, Milwaukee, and other west shore Lake Michigan points. Commodities purchased by complainant east of Chicago must pass through Chicago, Milwaukee, or some other west shore Lake Michigan point on their way to Sioux Falls, and become subjected to the freight rates in force between Chicago, Milwaukee, and other west shore Lake Michigan points and Sioux Falls. For many years last past complainant has annually received many car loads of freight shipped from or through Chicago to Sioux Falls, and many other car loads of freight shipped from or through Milwaukee to Sioux Falls. In carrying on its business in the past, complainant has found it necessary to ship a large proportion of said commodities, purchased as aforesaid, over the lines of the defendant, and that in the proper, necessary, and economical conduct of its business complainant will be obliged in the future to make its shipments, as in the past, over the defendant's lines. The freight tariffs upon such shipments heretofore made over defendant's lines from Chicago and other west shore Lake Michigan points have exceeded annually many times the sum of $2,000, and in the future conduct of its business complainant will be obliged to pay to defendant for like services many times the sum of $2,000 per annum. The business of complainant was commenced about the year 1889 by a copartnership under the name of Jewett Bros. & Jewett, and complainant succeeded to the business of said copartnership in or about the year 1892. The territory throughout which the complainant conducts its business is southwestern Minnesota, northwestern Iowa, and

South Dakota. Throughout said territory complainant has built up a large and extensive business, amounting to many hundred thousands of dollars of sales annually, and, for the purpose of carrying on said business, complainant has expended large sums of money in the purchase of real property in the said city of Sioux Falls, and in the erection of a large business block thereon and has also expended large sums of money in the building up of said business; the good will of said business amounting to $100,000. The defendant is engaged in the business of operating lines of railroad between the cities of Chicago, in the state of Illinois, and Green Bay, in the state of Wisconsin, and Kansas City, in the state of Missouri, Omaha in the state of Nebraska, and Sioux City in the state of Iowa, and Sioux Falls in the state of South Dakota, and is also engaged in operating lines of railroad traversing the states of South Dakota, Iowa, and Minnesota, throughout the territory in which the business of complainant is carried on. Prior to September 22, 1890, there were in effect between Chicago and other places on the west shore of Lake Michigan and the city of Sioux City in the state of Iowa what are commonly known as "Missouri river rates," while the rates from Chicago and other west shore Lake Michigan points to Sioux Falls averaged about 108 per cent. of the Missouri river rates. Between September 22, 1890, and February 14, 1891, the Missouri river rates were extended to Sioux Falls. Upon February 14, 1891, the rates between Chicago and Sioux Falls were again raised to an average of about 108 per cent. of the Missouri river rates in effect at Sioux City, Iowa. In the month of December, 1895, the freight rates between Chicago and Sioux Falls were placed upon the basis of 104 per cent. of the rates from Chicago to Sioux City and other Missouri river points.

This action of the defendant and other competing lines was caused by the decision of the Interstate Commerce Commission in the case of E. J. Daniels, against the defendant and other carriers, operating lines of railroad between Chicago and Sioux City, Iowa, and Sioux Falls, S. D., reported in volume 6, page 458, Interstate Commerce Commission Reports; the decision in the case referred to being that the rates from Chicago and other west shore Lake Michigan points and Sioux Falls should not exceed 104 per cent. of the Sioux City, Iowa, rate. These rates remained in effect on defendant's lines until on or about the 27th day of December, 1906, when defendant was compelled by reason of the lowering of the rates by the Great Northern Railway Company from Duluth to Sioux Falls, S. D., and Sioux City, Iowa, and adjacent territory, to lower its rates between Chicago and other west shore Lake Michigan points to Sioux Falls, by giving Sioux Falls the same rate as Sioux City, Iowa, or, in other words, what are called "Missouri river rates." The cities of Duluth, Minn., Chicago, and other west shore Lake Michigan points, are so located and related as to shipments of freight as to make carriers carrying freight from said points to the city of Sioux Falls, S. D., and Sioux City, Iowa, and adjacent territory, competitors of each other. The carriers, other than defendant, operating lines of railroad between Chicago and Sioux Falls, S. D., are Chicago, Rock Island & Pacific Railway Company,

Illinois Central Railway Company, and the Chicago, St. Paul, Minneapolis & Omaha Railway Company. The Great Northern Railway Company operates a railroad from Duluth, on Lake Superior, to Sioux Falls, S. D., and, as the Chicago roads are all competitors of each other in the hauling of Sioux Falls freight, their rates for the same class of freight must necessarily be the same. Prior to the 25th of May, 1907, the Great Northern Railway restored its rates from Duluth to Sioux Falls, which had been reduced in December, 1906, to the rates formerly existing, and, following such restoration, the defendant and other Chicago lines about the 26th day of May, 1907, gave notice as required by the interstate commerce act that at the expiration of 30 days their rates to Sioux Falls would be restored, as they were prior to December, 1906.

At the time said notice was given, there was pending and undetermined before the Interstate Commerce Commission a proceeding wherein the Sioux City Commercial Club of Sioux City, Iowa, was complaining that the giving of Sioux Falls the so-called Missouri river rates was an unlawful and unjust discrimination as against the jobbers and shippers of Sioux City, Iowa. All railways herein mentioned were made defendants in that proceeding. The Jobbers' & Shippers' Association of Sioux Falls also filed an intervening petition, asking that the Interstate Commerce Commission should decide that the city of Sioux Falls was entitled to Missouri river rates. On June 24, 1907, said proceeding before the Interstate Commerce Commission was dismissed on motion of the petitioner. On or about July 8, 1907, the complainant herein filed with the Interstate Commerce Commission a petition against the defendant and the Chicago, Rock Island & Pacific Railway Company, and the Chicago, St. Paul, Minneapolis & Omaha Railway, and the Illinois Central Railway Company, alleging that the rates which the defendant proposed to put into effect on June 27, 1907, between Chicago and other Lake Michigan points and Sioux Falls, and being 104 per cent. of the so-called Missouri river rates, were unreasonable and unjust and relatively unreasonable and unjust as compared with the rates from Chicago, Milwaukee, Green Bay, and other Lake Michigan points to Sioux City, Iowa, and that they subjected Sioux Falls and its locality and the wholesale merchants and jobbers thereof to unjust discrimination and undue and unreasonable prejudice and disadvantage. The different defendants in said last-named proceeding have answered said petition, and said proceeding is still pending and undetermined before the Interstate Commerce Commission. Complainant filed their original bill in this action in this court on June 22, 1907, and an order to show cause was issued upon the filing of the bill, which order contained a restraining clause enjoining the defendant from putting into effect the rates which it had given notice would go into effect on June 27, 1907. Upon the dismissal of the proceeding before the Interstate Commerce Commission by the Sioux City Commercial Club, complainant filed a supplemental bill in this action, setting forth the dismissal of said proceeding, and setting forth the facts concerning the commencement of a new proceeding by complainant before the Interstate Commerce Commission, asking that Sioux Falls be decided to be entitled to the so-

called Missouri river rates. A demurrer was filed herein by the defendant to the original bill. The bill was then amended by complainant and the demurrer overruled as to the amended bill, whereupon the supplemental bill was subsequently filed and the hearing of the order to show cause was continued until September 23, 1907. The restraining clause in the order to show cause remaining in effect has prevented the proposed rates which were to go into effect June 27th from becoming effective so far as the city of Sioux Falls is concerned. On September 23, 1907, being the day upon which the order to show cause was to be heard, why a temporary injunction should not issue, complainant and defendant filed a stipulation of facts, and submitted the case for final hearing upon the pleadings and said stipulation.

The bill filed in this action alleges that the rates which the defendant has given notice of and threatens to put into effect between Chicago and other west shore Lake Michigan points and Sioux Falls are unfair and unjust, and are unjustly discriminatory to the wholesale merchant and the manufacturers, jobbers, and shippers of Sioux Falls, and give an undue preference and advantage to the merchants of Sioux City to which Sioux City and its merchants are not entitled by either their geographical position, or the commercial importance of said city. The city of Sioux Falls is the largest city in the state of South Dakota, and the only city of the first class in the state. It is and for some years past has been the commercial and industrial metropolis of South Dakota. Since the decision of the Interstate Commerce Commission in the Daniels Case, supra, both the city of Sioux Falls and the city of Sioux City have largely increased in population and in commercial and industrial importance, and while along some lines, such as the distribution of agricultural implements, the growth of Sioux Falls has relatively exceeded that of Sioux City, along other lines, such as the packing industry, the growth of Sioux City has exceeded that of Sioux Falls. The city of Sioux Falls is a natural distributing center from which to supply southwestern Minnesota, northwestern Iowa, and South Dakota. The defendant in its unsworn answer interposed to the proceeding instituted by the Sioux City Commercial Club before the Interstate Commerce Commission denied that any of the rates set forth in the petition in said proceeding were excessive, unreasonable, or unjust, either of itself or in relation to any other rate in force upon its said lines, and alleged that each of said rates was just and reasonable. The allegation in the bill that the amount in controversy in this action exclusive of interest and costs exceeds $2,000 is not denied.

Upon this record counsel for complainant ask the court to render a final decree enjoining the defendant from putting into effect the proposed schedule of rates, so far as Sioux Falls is concerned, until the Interstate Commerce Commission can act on complainant's petition and determine the question as to whether the proposed rates are unjust or unreasonable and discriminatory as alleged. This position is taken by counsel, as the court understands, for the reason that they are of the opinion that on the authority of Texas & Pacific Railway Co. v. Abilene Cotton Oil Company, 204 U. S. 426, 27 Sup. Ct. 350, 51 L. Ed. 553, this court has no jurisdiction to inquire into the reason-

ableness or discriminatory character of the proposed schedule of rates; the power and authority to do this being in the Interstate Commerce Commission.

Counsel for defendant insist that the court, on the record presented, has no jurisdiction to grant any relief whatever, under the decision of the Supreme Court in the case last cited. The court overruled the demurrer to the original bill on the theory that the court had jurisdiction to enter into an investigation as to whether the rates complained of were unjust and unreasonable in themselves or discriminatory. The question first to be considered is: Has this court as a court of the United States jurisdiction to decide the question as to whether the proposed rate is lawful? In deciding this question, it will be well to bear in mind that the power to initiate and establish rates for the transportation of interstate freight over its lines, as the law now stands, is vested in the defendant, and it alone, subject only to the limitations prescribed by law that such rates shall be reasonable and just in themselves, and not unjustly discriminatory as between places, persons, or traffic, and subject, also, to the power of the Interstate Commerce Commission when satisfied after full hearing upon complaint made that any of the rates demanded, charged, or collected by said defendant are unjust and unreasonable or unjustly discriminatory or unduly preferential or prejudicial, to determine and prescribe what shall be just and reasonable rates thereafter to be charged as a maximum. The Interstate Commerce Commission has never directly or by implication been given the power to fix the rates for the carriage of interstate freight by common carriers in the first instance. Any power in the Interstate Commerce Commission to control or to have anything to say as to what rates a common carrier shall put in effect in the first instance for the transportation of interstate freight would be inconsistent with the power which the carrier beyond question now possesses. It is only when upon complaint the Interstate Commerce Commission finds that the carrier is demanding, charging, or collecting rates in violation of law that this power to interfere with the rates arises. The carrier cannot be said to be demanding, charging, or collecting a rate until it has put the same into effect. It results that the Interstate Commerce Commission has nothing to do with the rates which are not in effect, or, in other words, which are not being demanded, charged, or collected by the carrier. It is unnecessary to remark that the Interstate Commerce Commission is not a court of law or equity. We are not speaking now of the jurisdiction of this court as a court of equity, but as a court of the United States. Whether or not a given rate is reasonable and just, or whether it is unjustly discriminatory or prejudicial, are clearly judicial questions.

In this case we have not only a controversy between citizens of different states with the requisite amount in controversy, but the case is one arising under the laws of the United States. Then, why has not this court jurisdiction as a court of the United States? The case of Texas & Pacific Railway Co. v. Abilene Cotton Oil Co., supra, is cited as holding that the court has no jurisdiction in this action. That was a case where a shipper sought to recover in a court of law unreasonable rates from a carrier which had been exacted in accordance with

the schedule of rates put into effect and filed with the Interstate Commerce Commission. It was held that the interstate commerce act by implication deprived the courts of jurisdiction of such an action prior to any investigation of the unreasonableness of the rates by the Interstate Commerce Commission. The case is not parallel with the case at bar. The controversy in this case is over threatened action of the defendant concerning which the Interstate Commerce Commission has no authority whatever. In the later case of Southern Railway Co. v. Tift et al., 206 U. S. 428, 27 Sup. Ct. 709, 51 L. Ed. 1124, Justice McKenna, in delivering the opinion of the court, remarks concerning the case of Texas & Pacific Ry. Co. v. Abilene Cotton Oil Co., supra:

"We are not required to say, however, that, because an action at law for damages to recover unreasonable rates which have been exacted in accordance with the schedule of rates as filed is forbidden by the interstate commerce act, a suit in equity is also forbidden to prevent a filing or enforcement of a schedule of unreasonable rates or a change to unjust or unreasonable rates."

Strictly speaking, this language may be obiter, as the judgment of the court below was sustained on other grounds, but it is a declaration of an eminent jurist who took part in the decision of the Abilene Cotton Oil Case, that the decision in that case does not necessarily compel a decision that the court has no jurisdiction of the case at bar. If this court has no jurisdiction over the case stated in the bill, then complainant has no remedy; but this certainly cannot be true. It seems clear that as a court of the United States this court has jurisdiction. It is urged by counsel for defendant that to maintain jurisdiction in this case would cause the court in cases where relief is granted to make discriminatory rates, as the court can only act as between the parties to the suit, and a successful termination of the suit at bar in behalf of complainant would give Sioux Falls better rates than other towns similarly situated. It certainly can be no objection to the jurisdiction of a court that one who successfully invokes its aid fares better than one who does not. The courts are open to all for the protection of personal and property rights, and a want of uniformity in their decisions is no objection to the exercise of jurisdiction.

It is again urged that, if the court shall take jurisdiction in cases like the one at bar, it would be an assumption by the court of the rate-making power which it clearly does not possess. This objection, so far as it relates to courts of justice, involves a misapprehension of the power exercised by the court in taking jurisdiction of cases like the present one. The carrier has the undoubted power to fix a lawful rate for the transportation of interstate freight. It has no power to fix an unlawful rate. The court when it enjoins a proposed unlawful rate does not make any rate. It simply restrains the commission by the carrier of an unlawful act. The courts have for years enjoined the putting in force of rates promulgated by state boards of railroad commissioners on the ground that the rates were confiscatory, yet the carriers at least have not complained in those cases that the courts were exercising the rate-making power. The courts in enjoining a proposed unlawful rate do not, nor do they pretend to, disturb in any way rates

already in existence and in force. It also seems clear that complainant has no plain, speedy, and adequate remedy at law. In these days of fierce business competition a difference of a fraction of a cent in a freight rate may mean to the jobber or wholesaler success or failure in business. The damages which a shipper will suffer from an unjust or discriminatory freight rate is not the mere difference between a reasonable and just rate and an unreasonable and unjust rate. The putting in of an unjust rate or an unjustly discriminatory rate may, in addition to the damage caused by the payment of the rate itself, cause business ruin. Must the shipper when notice is given that a carrier intends to put in effect an unjust rate or an unjustly discriminatory rate which the shipper knows will ruin his business sit still, and let the rate go into effect, and then complain to the Interstate Commerce Commission, which after three or four years may decide the rate to be reasonable or unreasonable? Daniels v. Chicago, Milwaukee & St. Paul Ry. et al., 6 Interstate Commerce Commission Reports, 458 (complaint filed April 28, 1892, decided November 16, 1895). And, if the shipper is successful in his contention, he may then with business ruined go into court to enforce the award of the commission and at the end of three or four years more collect his damages, not those arising from the ruination of his business, but merely the excess paid by him over and above a reasonable rate. There is no plain and adequate remedy in such a proceeding. Courts of equity have often in similar cases enjoined the putting in effect of unlawful rates. Menacho v. Ward (C. C.) 27 Fed. 529; Southern Express Co. v. Memphis, etc., Ry. Co. (C. C.) 8 Fed. 799, affirmed in 10 Fed. 210; Coe v. Louisville, etc., Ry. Co. (C. C.) 3 Fed. 775; Tift v. Southern Ry. Co. (C. C.) 123 Fed. 790, and authorities cited. Also the numerous cases in which courts of equity have enjoined unlawful rates sought to be enforced by state authorities.

It results from the foregoing remarks that it is the opinion of this court that the court has jurisdiction of the case made by the pleadings both as a court of the United States and as a court of equity. Coming to the merits, the court is prohibited from going into an investigation of the lawfulness of the proposed rate complained of, for the reason that it has not been asked to do that, and the case has not been tried nor has evidence been taken on that theory. The relief asked is that the court enter a final decree enjoining the defendant from putting into effect the proposed rates complained of until the Interstate Commerce Commission decides the controversy arising upon the petition of complainant filed on or about July 8, 1907.

Complainant by its petition filed as aforesaid is not complaining of any rates of the defendant which are now in effect, and being demanded, charged, or collected by it, but is complaining of rates which the defendant intends to put in effect in the future, being the same rates that are complained of in this action. In accordance with what has been said heretofore in this opinion, this court is of the opinion that the Interstate Commerce Commission possesses no power or authority to pass upon the lawfulness of a rate merely threatened to be put in effect by the carrier. Such commission does not possess such power as a court of law or equity, nor has such power been conferred

upon it by law. This court, therefore, will not enjoin the defendant from putting into effect the proposed rates complained of, as prayed, as the tribunal whose power is invoked has no jurisdiction to decide the question presented to it and the issuance of an injunction would prevent the Interstate Commerce Commission from ever obtaining jurisdiction to investigate the lawfulness of the rate complained of.

If the court is in error upon this point, there is another fatal objection to the granting of the relief prayed for. The relief prayed for in the bill is asked on the theory, as the court supposes, as no definite theory has been advanced by counsel, that the proceeding may be likened to an equitable proceeding to restrain the commission of an injurious act threatened or being committed by a defendant in an action at law, such as the staying of waste pending an action in ejectment; but one of the necessary elements that must exist, before equity will grant relief in the supposed analogous cases, is that complainant's right to recover at law must be clear; for instance, in ejectment, his title must be perfect.

Without passing upon the lawfulness of the proposed rates complained of herein, the court must say that taking into consideration the fact that the business of complainant has grown to the proportions shown by the record under the rate proposed to be put into effect by the defendant, and taking into consideration the other facts shown by the record, that the cities of Sioux Falls, South Dakota, and Sioux City, Iowa, and adjacent territory, have prospered and developed equally, that there is no reasonable probability that the decision of the Interstate Commerce Commission upon complainant's petition would be other than what it was upon the petition of E. J. Daniels in 1895.

It results that the bill must be dismissed, with costs for want of equity; and it is so ordered.